# UNITED STATES DISTRICT COURT
# EASTERN DISTRICT OF WISCONSIN

---

**MANUEL ANTONIO HERRERA HERNANDEZ,**

    **Plaintiff,**

  **v.**                                                    **Case No. 21-cv-1057**

**DAVID CHURCHILL,** *et al.***,**

    **Defendants.**

---

## ORDER

---

Plaintiff Manuel Antonio Herrera Hernandez, who is currently incarcerated and represented by counsel, brings this lawsuit under 42 U.S.C. § 1983. (ECF No. 77.) The only remaining claims are claims pursuant to the Fourteenth Amendment alleging that defendants David Churchill, Lana Stelter, David Gebel, Marcus Kirchoff, David Winter, Kurt Weber, and Curtis Knoll treated Hernandez's complaints of stomach pain with objective unreasonableness. Dodge County and Wisconsin Municipal Mutual Insurance Company are named defendants for the sole purpose of indemnification for the Wisconsin state law claims, over which the court took supplemental jurisdiction. (ECF No. 87.) The defendants filed a motion for summary judgment. (ECF No. 127.) The motion is fully briefed and ready for a decision. For the reasons stated below, the court grants the defendants' motion for summary judgment.

# PRELIMINARY MATTERS

*Motion to Strike Defendants David Churchill's and Lana Stelter's Declarations (ECF No. 154)*

Hernandez moves to strike both the initial post-deposition declaration that Churchill and Stelter filed in support of their motion for summary judgment (ECF Nos. 128-129), and the supplemental declarations they filed with their reply brief (ECF Nos. 148-149). Hernandez asserts that these declarations are "inconsistent with their deposition testimony". (ECF No. 154 at 1.) Specifically, in his deposition, Churchill testified that he did not remember whether he had to call the nurse for Hernandez; did not remember whether Hernandez complained of pain or asked for medical attention; and did not remember signing Hernandez out for medical appointments outside what the records showed. (ECF No. 143-8 24:16-24; 35:5-10; 55:1-3; 58:20-24; 59-23-25). In his initial declaration filed on February 3, 2025, in support of the defendants' motion for summary judgment, Churchill averred that on the days he worked in Pod D, after review of the records and evidence, he recalled medical requesting to see Hernandez at various points and he sent Hernandez to medical on a few occasions; he was not provided with any information about Hernandez's medical issues; he was aware that Hernandez was being evaluated by medical; he did not observe any medical issues that Hernandez was suffering; and he did not recall if Hernandez reported pain. (ECF No. 128, ¶¶ 9-33.)

Stelter, in her deposition, testified that she did not remember Hernandez complaining about stomach pain; she did not remember interacting with any medical professionals; she did not remember a nurse asking her about Hernandez; she did not

remember a nurse telling her Hernandez was lying; and really did not recall interacting with Hernandez at all. (ECF No. 143-2, 14:10-23; 21:12-15; 21:24-22:-10; 27:9-13; 28:25-29:2.) In her initial declaration filed on February 3, 2025, in support of the defendants' motion for summary judgment, she averred that on February 9, 2020, she recalled Hernandez having a conversation with a jail nurse during medication pass but was never informed of any issue; she was aware that Hernandez was being seen by medical; she never stated that she thought Hernandez was lying about his symptoms; and she did not recall him complaining of pain or asking to see medical. (ECF No. 129, ¶¶6 6-11.)

Hernandez, in his response brief in opposition to the defendants' motion for summary judgment, argues that Churchill's and Stelter's initial declarations "create disputed issues of fact and raise credibility concerns." (ECF No. 146 at 11.) As a result, the declaration must be struck and summary judgment denied. (*Id.* at 11-13.) Hernandez takes issue with the fact that at deposition, both Churchill and Stelter did not recall much about their interactions with Hernandez on the relevant dates. Now, in their post-deposition declarations, they recall and provide more details, which Hernandez asserts makes their declarations contradictory to their deposition testimony.

In reply, Churchill and Stelter filed supplemental declarations that explained how their recollections were refreshed while preparing the motion for summary judgment. (ECF Nos. 148, 149.) Notably, they state that they both were able to review Hernandez's discovery responses and more relevant jail and medical records. They

also both point out that many of the events they stated they did not recall at their deposition, like Hernandez complaining of stomach pain, they continued to state in their initial declaration that they still did not recall them. (*Id.*)

Instead of filing a motion for leave to file a sur-reply brief, Hernandez filed a motion to strike both the initial and supplemental declarations stating that Churchill and Stelter could only provide such declarations if they can show that their deposition testimony was a product of confusion. However, Hernandez is construing the standard by which a court may consider a movant's post-deposition declarations too narrowly. When a court is "confronted by a declaration tendered by the moving party [it should refrain] from taking a rigid approach and . . . consider the totality of the circumstances in evaluating the declaration of a moving party." *Craig v. Wrought Washer Manufacturing, Inc.*, 108 F.4th 537, 544 (7th Cir. 2024). A court can accept such declarations where it "is convinced that the circumstances surrounding the deposition make it clear that consideration of the declaration is required to achieve clarity and accuracy." (*Id.*)

That is exactly the case here. Churchill's and Stelter's declarations do not contradict their deposition testimony. Neither stated that one thing was true in their deposition and the opposite was true in the declaration—for instance it is not like they testified that Hernandez never complained of stomach pain in their depositions and then in their declarations listed all the times Hernandez actually complained to them. At issue here is that at the time of their deposition, both Churchill and Stelter testified that they did not recall many things. Then, when it came time to file

4

summary judgment, after more discovery took place, they demonstrated that they refreshed their recollection on a few key events, providing more information to both the court and Hernandez in their declarations. Considering the complicated procedural history of this case, including amended complaints, identifying new defendants and claims, and the dismissal of several claims and defendants, it is not surprising that once materials were gathered for a summary judgment motion, the defendants had a clearer picture.

Also, with regard to their supplemental declarations, Hernandez brought up the argument in his response brief in opposition to summary judgment, and the defendants were entitled to reply to those arguments. In fact, this is exactly what Civil Local Rule 56(b)(3) contemplates—where the opposing party submits new information, the moving party can address this information in reply and support it with affidavits and declarations. Thus, the court will not strike the declarations and will consider them where appropriate in deciding the motion for summary judgment.

Hernandez requests that if the court declines to strike the affidavits, he be allowed to re-depose Churchill and Stelter "to examine the alleged basis of their newfound knowledge to ensure that the summary judgment procedure is not being used for an improper purpose." (ECF No. 154 at 11.) The court does not think this is necessary. Churchill and Stelter did not provide wholly new information. Instead, their declarations built on their prior deposition testimony. The declarations did not introduce any new facts that were not contained in the defendants' brief in support of their motion for summary judgment and related materials. The supplemental

5

declarations were directly responding to Hernandez's assertion that their initial declarations created credibility issues, so Hernandez should have anticipated the information supplied by the supplemental declarations because he essentially invited the defendants to provide it. If Hernandez truly believed that the defendants provided wholly new information that required an additional response, he could have moved to file a sur-reply. "The decision to permit the filing of a surreply is purely discretionary and should generally be allowed only for valid reasons, such as when the movant raises new arguments in a reply brief." *Merax-Camacho v. U.S.*, 417 F. App'x 558, 559 (7th Cir. 2011) (citing *Schmidt v. Eagle Waste & Recycling, Inc.*, 599 F.3 626, 631 n. 2 (7th Cir. 2010)). "In some instances, allowing a filing of a surreply 'vouchsafes the aggrieved party's right to be heard and provides the court with the information necessary to make an informed decision.'" *Univ. Healthsystem Consortium v. United Health Group, Inc.*, 68 F. Supp. 3d 917, 922 (N.D. Ill. 2014) (quoting *In re Sulfuric Acid Antitrust Litg.*, 231 F.R.D. 320, 329 (N.D. Ill. 2005)).

Regardless, the court believes that it has sufficient information to fairly decide the motion for summary judgment. Hernandez's motion to strike is denied.

*Scope of the Case*

The plaintiff, in his response materials, voluntarily dismissed defendants David Gabel, David Winter, and Marcus Kirchoff. (ECF No. 146 at 1.) They also voluntarily dismissed their Wisconsin state law claim. As such, defendants Dodge County and Wisconsin Municipal Mutual Insurance Company are also dismissed. The

remainder of this order will focus on the Fourteenth Amendment claims against Churchill, Stelter, Weber, and Knoll.

## FACTS

From January 9, 2020, to March 30, 2020, Hernandez was an ICE detainee at the Dodge County Detention Center. (ECF No. 144, ¶ 1.) Hernandez was housed in Pod D from January 9, 2020 to February 12, 2020. (*Id.*, ¶ 38.) "Pod D is the least restrictive Pod at the Dodge County Detention Center" and "is a direct supervision pod which means that only one officer is assigned to that Pod between 6:00 a.m. and 10:00 p.m." (*Id.*, ¶¶ 31, 34.) During lock downs, shift change, delivering meals, and medicine pass, an additional officer, called the "rover officer" would come into Pod D to assist with those specific tasks. (*Id.*, ¶¶ 34, 35.) If a prisoner made a "nonemergency complaint or request for medical care to the rover officer", it is undisputed that the rover officer could refer that prisoner to the Pod officer for assistance. (*Id.*, ¶ 36.)

*Hernandez's Interactions with Churchill*

On February 5, 2020, Churchill, a correctional officer employed by Dodge County, was the Pod D Officer and worked from 6 a.m. to 2 p.m. (ECF No. 144, ¶ 67.) Hernandez alleges that sometime on February 5, 2020, (though he does not give a time or even general time of day) he told Churchill that the right side of his abdomen hurt, showing him with his hand where it hurt. (ECF No. 151, ¶¶ 16-17.) The jail log indicates that on that day, at approximately 9:57 a.m., Churchill sent Hernandez to the jail's Health Services Unit (HSU). (ECF No. 144, ¶ 69.) Hernandez returned to Pod D at approximately 10:23 a.m. (*Id.*) Hernandez's medical records show that he

7

was examined by non-defendant Nurse Practitioner Debra Knisbeck, where Hernandez reported "red bumps with clear fluid" that was on his pelvis. (ECF No. 140-2.) Upon Hernandez's return, Churchill states that he "was not provided with any information from the medical staff as to Mr. Hernandez's medical issues or complaints or given any recommendations from HSU or the need to monitor Mr. Hernandez for any medical issue." (ECF No. 144, ¶ 72.) Churchill also states that he "did not observe any medical issue with Mr. Hernandez or that he was in need of any immediate medical attention on February 5, 2020." (*Id.*, ¶ 74.)

Churchill worked again as the Pod D officer on February 6, 2020, from 6:00 a.m. to 2:00 p.m. (ECF No. 144, ¶ 76.) Churchill states that when he started his shift that morning, he "was not provided with any information about any medical issue with Mr. Hernandez." (*Id.*) Hernandez asserts that on February 6, 2020, (though he does not give a date or general time of day) he complained to Churchill that the right side of his abdomen hurt. (ECF No. 151, ¶ 16.) At approximately 1:00 p.m. on February 6, Churchill "permitted Mr. Hernandez to leave the Pod and go to HSU either because Mr. Hernandez made a request to Officer Churchill or because HSU contacted [Churchill] requesting to see Mr. Hernandez due to a request he may have made"; Churchill does not fully recall the reason. (ECF No. 144, ¶ 77.) According to Hernandez's medical records, Hernandez was "urgently seen in clinic [by Knisbeck] per patient complaints of increasing lower abdominal discomfort" at approximately 1:00 p.m. (ECF No. 140-3 at 1.) The physician was called and notified of Hernandez's

8

condition. (*Id.*). Knisbeck placed Hernandez on "medical observation." (ECF No. 144, ¶ 49.)

Hernandez returned from HSU at approximately 1:16 p.m., and Churchill states he "was not provided with any information from the medical staff as to Mr. Hernandez's medical issues or complaints or any recommendations from HSU as to any need for a special watch, new cell assignment, or that he should be monitored by the officers." (ECF No. 144, ¶ 79.) It is undisputed that Churchill then did not have any contact with Hernandez until February 11, 2020, when he was again assigned as Pod officer for Pod D. (ECF No. 144, ¶ 81.) However, Hernandez asserts that "[w]ithin the first few days of Mr. Hernandez complaining to Churchill, Churchill began ignoring Mr. Hernandez's complaints." (ECF No. 151, ¶ 18.) Given that Churchill was not working during most of that period, it is unclear what Hernandez means by this.

On February 11, 2020, Churchill worked from 6:00 a.m. to 2:00 p.m. as Pod Officer on Pod D. (ECF No. 144, ¶ 82.) When he started his shift, he did not receive any information about Hernandez's medical needs such as HSU recommendations or issues that needed monitoring. (*Id.*) Churchill states that "shortly after 1:00 p.m. [he] allowed Mr. Hernandez to leave the Pod to see HSU due to his request to be evaluated by HSU." (*Id.*, ¶ 83.) According to Hernandez's medical records, he was "[u]rgently seen in clinic per patient concern of abdominal discomfort." (ECF No. 140-5 at 1.) Hernandez was referred to non-defendant Dr. Godiwalla. (*Id.*) Hernandez asserts that at some point in time on February 11, 2020, (again he gives no specific time or general time of day), he told Churchill that the right side of his abdomen hurt. (*Id.*, ¶

9

16.) When Hernandez returned from the HSU on February 11, Churchill asserts he was not provided with any information from HSU regarding Hernandez's medical condition including any recommendations or monitoring instructions. (ECF No. 144, ¶ 84.)

On February 12, 2020, Churchill worked from 6:00 a.m. to 2:00 p.m. as the Pod D officer. (ECF No. 144, ¶ 86.) When he began his shift, he was not provided with any information regarding Hernandez's health condition. (*Id.*) Hernandez asserts that at some point on February 12, 2020, without giving a specific time or general time of day, he again complained to Churchill that the right side of his abdomen hurt. (ECF No. 151, ¶ 16.) According to Hernandez's medical records, at 9:45 Hernandez went to the HSU for the appointment with Dr. Godiwalla that had been set the day before. (ECF No. 141-1 at 15.) Dr. Godiwalla gave Hernandez a treatment plan for his stomach pain and sent him back to Pod D. (*Id.*; ECF No. 144, ¶ 64.) Churchill asserts that upon Hernandez's return, he was not provided with any information as to his medical condition or treatment plan. (*Id.*, ¶ 89.)

Hernandez went back to the HSU at 3:00 p.m. that day because according to his medical records, he was "urgently seen in clinic per patient request for increasing abdominal comfort." (ECF No. 140-6 at 1.) This occurred after Churchill's shift. (ECF No. 144, ¶ 86.) Eventually, at 5:56 p.m. Hernandez was sent to the hospital where he was diagnosed with appendicitis. (*Id*, ¶ 66.) His appendix had ruptured, and he developed a large abscess, which required an "open appendectomy", a more invasive

10

procedure than would have been required had he undergone surgery earlier. (ECF No. 151, ¶¶ 71, 73.)

Hernandez notes that during his shifts, Churchill did not proactively communicate with the medical providers to obtain information or "obtain assurances" that Hernandez was being cared for or regularly monitored (ECF No. 151, ¶¶ 23-24, 26-27.) He also states that Churchill was unaware that Hernandez was placed on medical observation. (*Id.*, ¶ 25.)

*Hernandez's Interactions with Stelter*

On February 9, 2020, Stelter was the Pod Officer in Pod D from 2:00 p.m. to 10:00 p.m. (ECF No. 144, ¶ 93.) Stelter states that she was "generally aware" that Hernandez was taking medication because he would come to medication pass. (*Id.*, ¶ 94.) Other than that, when she started her shift, she did not receive any information about Hernandez's medical condition. (*Id.*, ¶ 95.) At some point on February 9, 2025, Hernandez does not state specifically what time or give a time of day, Hernandez asserts he complained to Stelter about his abdomen pain and used his hand to show her where it hurt. (ECF No. 151, ¶¶ 29-30.) He also states that Stelter did not give him a health care request form, though he does not indicate if he asked for one. (*Id.*, ¶ 32.) Stelter states that during the 5:30 p.m. medication pass she saw Hernandez talking to a nurse. (ECF No. 144, ¶ 99.) Other than that, she was unaware of any medical issues with Hernandez. (*Id.*, ¶ 102.) Hernandez also states that Stelter told a nurse at med pass that she thought Hernandez was faking his symptoms. (ECF No. 151, ¶ 34.) The defendants assert that Hernandez testified that it was actually the

11

nurse that told Stelter he was faking his symptoms. (*Id.*) Hernandez's deposition testimony, which both parties cite to for these facts states the following:

> Q: Okay. I'm going to keep going with this paragraph [of Hernandez's inmate complaint about the situation]. It says, "The nurse came to the unit and she told the CO I was lying or faking, that I was fine." Which CO are you referring to?
>
> A: Just Stelter.

(ECF No. 143-4; 33: 6-13.) Hernandez's medical records indicate that he had conversations with nurses during med pass on February 9, 2020, but it does not appear that he was examined in HSU. (ECF NO. 141-1 at 23.)

*Alleged Interactions with Weber*

The defendants assert that on February 9, 2020, Weber worked as a rover officer assigned to work in Pod H. (ECF No. 144, ¶ 130.) As such, he did not work in Pod D that day and had no interaction with Hernandez. (*Id.*) Hernandez states that Weber was not assigned to Pod H. (*Id.*) Hernandez also states that Weber, as rover officer, would come to Pod D during lock down periods, which were around 2:00 p.m., 4:30 p.m., and 9:30 p.m. (ECF No. 151, ¶ 43.) The defendants again reiterated that Weber was a rover officer for Pod H on that date. (*Id.*) Hernandez asserts that Weber was the relevant officer because Hernandez "positively identified Defendant Weber, via photograph, as one of the correctional officers who ignored his medical complaints." (*Id.*, ¶ 41.)

At 9:30 p.m. on February 9, 2020, Hernandez pushed the intercom button for help because he was in pain and needed medical attention. (ECF No. 151, ¶¶ 43-45.)

12

Hernandez asserts that Weber responded to Hernandez's cell, and Hernandez told him that he was in severe pain. (*Id.*, ¶¶ 46, 47.) Weber then yelled at Hernandez for pushing the intercom button and left. (*Id.*, ¶ 48.) Hernandez pushed the button again, and at this point asserts he "was on the floor by his cell door and unable to lay on his bed." (*Id.*, ¶ 50.) Weber responded again and Hernandez told him that he was in a lot of pain and asked him to call a nurse. (*Id.*, ¶ 51.) Weber again told Hernandez to stop pressing the button "despite Mr. Hernandez crying in pain." (*Id.*, ¶ 52.) Weber did not call the nurse. (*Id.*, ¶ 53.) The defendants dispute this because employment records show Weber was assigned to Pod H, not Pod D. (*Id.*) The defendants also note that the second time Hernandez pushed the intercom button, it was after 10:00 p.m., so Weber was no longer on shift. (*Id.*)

*Hernandez's Alleged Interactions with Knoll*

Hernandez asserts that on February 10, 2020, from 6:00 a.m. to 11:00 a.m., Knoll worked as a rover officer, and because no guard was assigned to Pod D during that time, Knoll "could have been assigned to Pod D." (ECF No. 151, ¶ 60) If Knoll was not assigned to Pod D, then "Knoll would have had contacted [*sic*] with Mr. Hernandez in Pod D during shift changes, lock downs, mealtimes, med pass, and other times." (*Id.*) The defendants assert that non-defendant Officer Bruss, Owens, and Koch were assigned to Pod D on February 10, 2020. (*Id.*)

At some point (presumably on February 10, though it is not clear from the record) Hernandez states he asked Knoll for medical attention and to be moved from his second-floor cell to his first-floor cell because he was having a hard time using the

stairs due to his stomach pain. (*Id.*, ¶¶ 61-63.) Despite Hernandez obviously walking hunched over, Knoll ignored him and made fun of him. (*Id.*, ¶ 65.) The defendants dispute this. (*Id.*) Hernandez states he positively identified Knoll via a photograph as the officer who ignored him on this date. (*Id.*, ¶ 57.)

## SUMMARY JUDGMENT STANDARD

The court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(a); *see also Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986); *Celotex Corp. v. Catrett*, 477 U.S. 317, 324 (1986). "Material facts" are those under the applicable substantive law that "might affect the outcome of the suit." *See Anderson*, 477 U.S. at 248. A dispute over a "material fact" is "genuine" if "the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Id.*

In evaluating a motion for summary judgment, the court must view all inferences drawn from the underlying facts in the light most favorable to the nonmovant. *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986). However, when the nonmovant is the party with the ultimate burden of proof at trial, that party retains its burden of producing evidence which would support a reasonable jury verdict. *Celotex Corp.*, 477 U.S. at 324. Evidence relied upon must be of a type that would be admissible at trial. *See Gunville v. Walker*, 583 F.3d 979, 985 (7th Cir. 2009). To survive summary judgment a party cannot just rely on his pleadings but "must set forth specific facts showing that there is a genuine issue for

14

trial." *Anderson*, 477 U.S. at 248. "In short, 'summary judgment is appropriate if, on the record as a whole, a rational trier of fact could not find for the non-moving party.'" *Durkin v. Equifax Check Servs., Inc.*, 406 F.3d 410, 414 (7th Cir. 2005) (citing *Turner v. J.V.D.B. & Assoc., Inc.*, 330 F.3d 991, 994 (7th Cir. 2003)).

## ANALYSIS

Hernandez claims the defendants violated his Fourteenth Amendment rights when they failed to get him medical care for his appendicitis. Under the Fourteenth Amendment's due process clause, a plaintiff must show that (1) "he suffered from an objectively serious medical condition" and (2) "the staff's response to it was objectively unreasonable." *Williams v. Ortiz*, 937 F.3d 936, 942-943 (7th Cir. 2019). To assess objective unreasonableness, the "standard requires courts to focus on the totality of facts and circumstances faced by the individual alleged to have provided inadequate medical care and to gauge objectively—without regard to any subjective belief—whether the response was reasonable." *McCann. Ogle Cty. Ill.,* 909 F.3d 881, 866 (7th Cir. 2018).

The parties do not dispute that appendicitis is an objectively serious medical condition.

### *Claim Against Churchill*

Hernandez asserts that at some point he told Churchill he was experiencing stomach pain. Churchill does not recall Hernandez ever complaining about stomach pain. Hernandez does not give any details about when, or even approximately what time of day, he told Churchill about his stomach pain and what Churchill did (or did

15

not do) with that information. At most, Hernandez states that at some point Churchill started ignoring his complaints after a few days, but that assertion does not match the undisputed fact that after February 6, 2020, Churchill did not work in Pod D until February 11, 2020. "It is well established that in order to withstand summary judgment, the non-movant must allege specific facts creating a genuine issue for trial and may not rely on vague, conclusory allegations." *Sommerfield v. City of Chicago*, 863 F.3d 645, 649 (7th Cir. 2017). Hernandez's assertions are too vague to demonstrate that he repeatedly told Churchill about his stomach pain, and Churchill ignored him.

Even if Churchill were aware of Hernandez's stomach pain, it is undisputed that Churchill sent Hernandez to the HSU on several occasions. As a security officer, that was the extent of his responsibility. Non-medical professionals, like security officers are "entitled to reply on the medical professionals' determination[s]" concerning a prisoner's health care and recommended treatment. *McGee v. Adams*, 721 F.3d 474, 483 (7th Cir. 2013). "[T]he only exception to this rule is that nonmedical officers may be found deliberately indifferent if they have reason to believe (or actual knowledge) that prison doctors or their assistants are mistreating (or not treating) a prisoner." *King v. Kramer*, 680 F.3d 1013, 1018 (7th Cir. 2012) (internal quotations omitted). In the Fourteenth Amendment context, then, it follows that the only exception would be if a reasonable officer would have reason to believe that the medical professionals were not properly treating a prisoner. *McCann*, 909 F.3d at 886. There is nothing in the record to suggest that a reasonable officer in Churchill's

16

shoes would have acted any differently. It is undisputed that Churchill did not receive instructions or treatment instructions from HSU staff or even that he was made aware of Hernandez's issues. Hernandez suggests that Churchill should have proactively reached out to the HSU to inquire about Hernandez's medical status and whether he had a care plan. But it is not a security officer's job to proactively follow up with HSU to check whether they are appropriately treating a prisoner unless it is obvious that a prisoner is not being appropriately treated. *See Jackson v. Pollion,* 733 F.3d 786, 787 (7th Cir. 2013) ("In failing to ascertain whether the medical staff was dealing effectively with the problem, the correctional counselor was at worst negligent); *Burks v. Raemisch*, 555 F.3d 592, 596 (7th Cir.2009) (Prisons "divide tasks; no prisoner is entitled to insist that one employee do another's job.") Hernandez did not present sufficient evidence to suggest that Churchill was aware that the HSU was not appropriately treating him. Summary judgment is granted in favor of Churchill.

*Claims Against Stelter*

Similar to his assertions against Churchill, Hernandez vaguely asserts that at some point he complained about his stomach pain to Stelter. As discussed above, this assertion, without more, is too vague to create a question of material fact. Taking the facts in a light most favorable to Hernandez, other than the vague assertion that he told Stelter about his stomach pain, he presents no evidence that Stelter had reason to believe either that Hernandez needed medical assistance or that the HSU was not providing sufficient care. At most, his assertion that Stelter told a nurse that she

17

believed he was lying about his condition is the most specific allegation he presents, but that misconstrues the record. Hernandez testified at his deposition that it was the nurse who told Stelter that she believed he was faking his ailment. "Summary judgment is the proverbial put up or shut up moment in a lawsuit, when a party must show what evidence it has that would convince a trier of fact to accept its version of the events." *Beardsall v. CVS Pharmacy, Inc.*, 953 F.3d 969, 973 (7th Cir. 2020). "It is therefore incumbent on the party opposing a summary judgment motion to 'inform the district court of the reasons why summary judgment should not be entered'" *Reed v. Brex, Inc.*, 8 F. 4th. 569, 578 (7th Cir. 2021) (quoting *Riely v. City of Kokomo*, 909 F.3d 182, 190 (7th Cir. 2018)). Hernandez does not present enough evidence to demonstrate a material question of fact as to whether Stelter acted with objective unreasonableness towards his appendicitis. Summary judgment is granted in her favor.

*Claims Against Weber and Knoll*

Hernandez asserts that on February 9, 2020, Hernandez pushed his intercom button complaining of stomach pain and asking for medical attention, but Weber, in response, told him to stop using the button and left without procuring treatment. Hernandez then pushed the button a second time, and Weber again ignored Hernandez despite Hernandez crying in pain and being doubled over. Hernandez states that he knew it was Weber who did this because he identified him via photograph. The defendants assert that it could not have been Weber because records show that he was working on Pod H that day and not Pod D, and his shift ended

before the second incident took place. Whether it was Weber who ignored Hernandez's complaints is a material question of fact. Even though the employment records show that Weber was working elsewhere, such records are not infallible. Whether Weber was on Pod D and ignored Hernandez are credibility questions not resolvable at summary judgment.

Similar to Weber, a reasonable factfinder could conclude that Knoll acted with objective unreasonableness when he ignored Hernandez's request for a new bunk assignment, requests for medical help, and made fun of him on February 10, 2020. The defendants again assert that Knoll was not working on Pod D that day, but as discussed above, this is a credibility question not resolvable at this stage.

*Causation*

Despite these unresolved factual issues, summary judgment is nevertheless appropriate for both of these defendants. That's because even if we credit Hernandez's version as to what Weber and Knoll did, or didn't do, Hernandez has not provided any reason to believe their conduct exacerbated or caused the harm Hernandez eventually suffered. Hernandez claims that the delay in getting to the hospital resulted a more serious and dangerous surgery, as well as additional days of pain and recovery time in the hospital. That is likely true. But, because medical staff were already treating the plaintiff, and because they examined him multiple times and did *not* send him to the hospital—including twice *after* Weber and Knoll's alleged actions— the record demonstrates that the medical staff would have taken the same action regardless of anything Weber or Kroll did. Ultimately, Hernandez cannot show that Weber and

19

Knoll's conduct played any meaningful role in prolonging his pain or delaying the appendicitis surgery Hernandez ultimately underwent.[1]

First, it's clear from the jail records that the plaintiff's principal concern during the week in question involved his inability to have a bowel movement and associated pain, not an urgent medical emergency. On February 7, he filed a medical request indicating that he had not had a bowel movement for four days and was in pain. (DPFOF ¶ 52.) The next day, Nurse Jorgenson saw him during medication pass and he reported having a bowel movement and improved abdominal pain. (DPFOF ¶ 53.) The following day, the constipation returned, and Hernandez again indicated that he was unable to have a bowel movement. (DPFOF ¶¶ 57-59.) On February 9, Hernandez submitted a health services request asking for a suppository. Two days later, Nurse Practitioner Knisbeck saw him in the health services office and prescribed magnesium citrate, a laxative. The next day, the 12th, Dr. Godiwalla saw the plaintiff in the morning and prescribed lots of water as well as lactulose and Miralax (both osmotic laxatives) daily. (DPFOF ¶¶ 60-64.) It was only later that afternoon, following another visit with Nurse Practitioner Knisbeck, that Hernandez was sent to the hospital.

The back-and-forth between Hernandez and the medical team suggests an ongoing differential diagnosis addressing the exceedingly common symptoms of abdominal pain and constipation, which is what the plaintiff himself reported. In the midst of this period—the evening of the 9th and morning of the 10th—Hernandez

---

[1] Of course, these causation concerns apply to claims against Stelter and Churchill as well.

alleges that Weber and Knoll ignored his pain complaints. Even if true, on the 11th he saw the nurse practitioner and had the ability to tell her exactly what he had been experiencing during the previous several days. Nevertheless, she did not send him to the hospital but instead prescribed a laxative. The following morning, Hernandez saw the prison's doctor, with the same result. Crucially, Hernandez does not explain how any *earlier* involvement from either Weber or Knoll would have made Nurse Practitioner Knisbeck or Dr. Godiwalla more likely to send him to the hospital or take some more aggressive course of action. In both instances, the medical staff had access to all the relevant information about the plaintiff's condition and chose to treat him for constipation rather than appendicitis. Thus, even if Hernandez's allegations are true, neither Weber nor Kroll caused the delay in receiving surgery.

Several cases illustrate this point. The defendants point to a case from the Northern District of Illinois, *Sauls v. Cnty. of Lasalle,* No. 22-CV-00255, 2023 WL 4864985, at *4 (N.D. Ill. July 31, 2023). There, jail deputies conducting an intake screening learned that the plaintiff was suicidal. They ordered him placed in a padded cell. The next day, the plaintiff met with a social worker, who ordered him out of the cell into a normal cell block. The plaintiff committed suicide within the next two days. The plaintiff's estate sued the county sheriff for providing inadequate medical care relating to the original intake screening. The court found that any constitutional infirmities arising out of the plaintiff's intake screening could not be a cause of his suicide, however, because the suicide resulted from the social worker's *subsequent* decision to move him to a regular cell. "The allegation that the Sheriff's Deputies that

performed Proctor's initial intake failed to inform any other Deputies about Proctor's past suicide attempts is also unpersuasive. There is no causal connection to Proctor's injury because those same Deputies placed Proctor, who was later medically examined, in a padded cell. . . . Proctor's later medical examination breaks the causal link between his initial intake . . . and his unfortunate death." *Id.* at *3. The same holds true here: the subsequent evaluations by Nurse Knisbeck and Dr. Godiwalla break any causal link that might have resulted from the alleged deliberate indifference of Weber or Knoll.

The court's own research found the case of *Prince v. Reyes,* 171 F. App'x 645, 646–47 (9th Cir. 2006), where the Ninth Circuit addressed a similar fact pattern. There, deputies allegedly ignored the prisoner's medical requests. However, when the prisoner was finally referred to the medical unit, the medical providers failed to uncover a serious problem. Accordingly, the deputies who allegedly ignored the plaintiff's requests were not deemed a cause of his subsequent injury. "Even assuming, arguendo, that the deputies did not respond appropriately to his medical requests, the undisputed evidence indicates that if they had referred him to the prison medical facility, the result would not have been different. When he was referred, medical personnel only provided hand and wrist support, an ice pack, and Motrin. This commenced a series of medical visits which did not result in an accurate diagnosis for approximately three weeks." *Id.* Ultimately, the court found that "[t]he undisputed facts indicate that a prompt referral would not have produced a different outcome." *Id.*

The court reached a similar result in *Teters v. Washington,* where the inmate plaintiff complained that placement in the general population would cause him to suffer panic attacks and injuries. No. 318CV05481RBLJRC, 2019 WL 8128925, at *1 (W.D. Wash. Nov. 22, 2019), report and recommendation adopted, No. 318CV05481RBLJRC, 2020 WL 1031399 (W.D. Wash. Mar. 3, 2020). The plaintiff alleged that, upon intake to the prison, he told defendant DeMark that he couldn't be placed in the general population due to his PTSD, but the defendant ignored that demand. Days later, the plaintiff received a mental health exam from the prison psychologist. The psychologist overruled the plaintiff's concerns and placed him in the regular population.

> Even if defendant DeMark could have requested immediate follow-up and assessment, here, plaintiff specifically alleges that within a few days of his intake, he had a mental health assessment with defendant [psychologist] Burt, where plaintiff states that he again relayed his 100% disability and inability to cope with placement in the general population to defendant Burt. But, as noted above, defendant Burt disagreed and indicated that no alternate housing needs were necessary at the time. . . . Thus even if defendant DeMark had taken action, there is no evidence from which a reasonable trier of fact could find that the outcome would have differed.

*Id.* at *5. Defendant DeMark's earlier conduct, even if deliberately indifferent, didn't cause the injury.

These cases stand for a principle that is unremarkable with respect to any defendant, namely, that a plaintiff must prove the defendant is a cause of the plaintiff's injury. More specifically, the cases hold that, when a plaintiff alleges that a non-medical officer ignored his medical complaints, the officer's conduct will not be deemed a cause of injury if medical staff are already treating the plaintiff's condition

23

adequately or if subsequent review by medical providers finds no emergency. In those instances, as here, the role of the non-medical officers is incidental and immaterial to the outcome: as the court in *Prince* said, "if they [officers] had referred him to the prison medical facility, the result would not have been different." 171 F. App'x at 647. This of course is not some kind of categorical rule, but merely an application of standard causation principles that might or might not apply in cases like this, depending on the facts. Here, the plaintiff has not even attempted to explain how any actions of the defendant guards would have caused him additional harm in light of the treatment he received from both Nurse Knisbeck and Dr. Godiwalla. Accordingly, on this record, the defendants are entitled to summary judgment.

## ORDER

**NOW, THEREFORE, IT IS HEREBY ORDERED** that Hernandez's motion to strike Churchill's and Stelter's declarations (ECF No. 154) is **DENIED**.

**IT IS FURTHER ORDERED** that defendants David Gabel, David Winter, Marcus Kirchoff, Dodge County and Wisconsin Municipal Mutual Insurance Company are **DISMISSED**.

**IT IS FURTHER ORDERED** that the defendants' motion for summary judgment (ECF No. 127) is **GRANTED.** Claims against Churchill, Stelter, Knoll and Weber are **DISMISSED**. Dated in Milwaukee, Wisconsin this 7th day of July, 2025.

STEPHEN DRIES
United States Magistrate Judge